UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY WARWICK, et al., <br>     Plaintiffs, <br> v. <br> REJUVI LABORATORY, INC., <br>     Defendant. | Case No. 18-cv-02701-MEJ <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: Dkt. No. 8 |

## INTRODUCTION

Pending before the Court is Defendant Rejuvi Laboratory, Inc.'s Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Plaintiffs Ashley Warwick and Summer Olson filed an Opposition (Dkt. No. 15) and Rejuvi filed a Reply (Dkt. No. 18). The Court finds this matter suitable for disposition without oral argument and **VACATES** the August 9, 2018 hearing. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Rejuvi's Motion for the following reasons.

## BACKGROUND

### A. Allegations Regarding Plaintiff Warwick

On September 11, 2017, Ashley Warwick received a Rejuvi tattoo removal procedure from Carmen Tasse. Compl. ¶ 7, Dkt. No. 1. Plaintiffs allege Ms. Tasse was "trained by Rejuvi to sell Rejuvi tattoo removal services and product and acted as an agent for Rejuvi in doing so." *Id.* Prior to undergoing the procedure, Ms. Tasse informed Ms. Warwick that she was certified by Rejuvi to perform the Rejuvi tattoo removal procedure and that the procedure was well-tested and safe. *Id.* ¶ 8.

Prior to beginning the Rejuvi procedure, Ms. Warwick expressed concerns about the safety and potential results of the procedure, requesting the opportunity to return home to research and spend some time considering the procedure. *Id.* ¶ 9. In addition to the representations described above, Ms. Tasse responded to Ms. Warwick's concerns with high pressure sales tactics, including telling Ms. Warwick that Ms. Tasse was in constant communication with Rejuvi and that there was nothing for her to worry about. *Id.* As part of the high-pressure sales pitch, Ms. Tasse showed her pictures purporting to be of the results obtained by previously clients using the Rejuvi tattoo removal procedure. *Id.* ¶ 10. In retrospect, Ms. Warwick believes that some or all of the phots were "doctored" or fake. *Id.*

Ms. Warwick relied upon the representations of Ms. Tasse regarding the safety and efficacy of the Rejuvi system, Ms. Tasse's asserted training and certification, the apparently successful results in the putative photos, and Ms. Tasse's assurances that she was in constant contact with Rejuvi in making the decision to proceed with the Rejuvi treatment. *Id.* ¶ 11. Ms. Tasse informed Ms. Warwick that the entire procedure would cost $650, and that $150 would be required in advance. *Id.* Because of the high-pressure sales pitch, Ms. Warwick paid the $150 and began the Rejuvi procedure. *Id.*

By September 17, problems with the procedure began to appear, as the scar created by the procedure was unexpectedly looking like it had become infected in certain areas and was increasingly painful. *Id.* ¶ 12. Ms. Warwick made an appointment for Ms. Tasse to review the progress of the procedure. *Id.* By the next day, the pain was virtually unbearable, as it was so severe that Ms. Warwick was barely able to lay down, or to walk, or to otherwise be mobile. *Id.* ¶ 13. Nonetheless, Ms. Warwick agreed paid an additional $475 toward the original amount charged for the procedure. *Id.*

Instead of returning to Ms. Tasse, Ms. Warwick made an appointment to meet with a medical doctor to get a trained medical opinion about the status and prognosis. *Id.* ¶ 14. She informed Ms. Tasse of that decision and her further decision not to continue with the next steps of the procedure and not to pay the remainder of the fee for the procedure. *Id.* However, after three calls from Ms. Tasse telling Ms. Warwick not to see a medical doctor because she would not

2

understand the procedure or the anticipated progress of the recovery and would simply give her bad advice. *Id.* ¶ 15. Ms. Warwick reluctantly agreed to skip the doctor's appointment and to meet the next day with Ms. Tasse and a former client of Ms. Tasse who purportedly was recovering well from the Rejuvi procedure. *Id.*

After the pain worsened overnight and she had reflected further on the high-pressure tactics of Ms. Tasse, Ms. Warwick on September 19 was not comfortable returning to Ms. Tasse and felt it was critical to see a medical professional. *Id.* ¶ 16. She therefore went to see a doctor at the local urgent care facility (paying a $45 co-pay). *Id.* By this point, the pain from the procedure was so severe that Ms. Warwick was unable to go to work. *Id.* The doctors at urgent care were shocked by what they saw and immediately prescribed antibiotics to fight the infection and Vicodin for the severe pain. *Id.* ¶ 17. Ms. Warwick reported her urgent care visit and its results to Ms. Tasse, who became extremely upset and berated Ms. Warwick for seeing a doctor rather than simply visiting Ms. Tasse. *Id.* ¶ 18.

On September 20, Ms. Warwick was again unable to work. *Id.* ¶ 19. And again Ms. Tasse called to berate Ms. Warwick about paying the remainder of the $650 quoted fee and demand that Ms. Warwick permit Ms. Tasse to inspect the infection and offer her own medical instructions. *Id.* Ms. Warwick felt bullied and imposed upon, and refused. *Id.*

On September 23, Ms. Warwick went to the HonorHealth SOMC Emergency Department for further treatment. *Id.* ¶ 20.

On September 24, Ms. Warwick sent Ms. Tasse a photo of the badly infected site of her tattoo. Ms. Tasse again demanded that Ms. Warwick travel to the location of the Rejuvi procedure and consult in person with Ms. Tasse. *Id.* ¶ 21. Given the horrific results of the procedure to date and the high-pressure bullying tactics of Ms. Tasse, Ms. Warwick declined to go back and demanded a refund of the money she had already paid, in addition to requesting that Ms. Tasse stop contacting and harassing her. *Id.* Ms. Warwick also went for her third medical visit, returning to the urgent care facility in an effort to stem the infection and lessen the pain. *Id.* During this period, the infection and pain were so bad that Ms. Warwick was prescribed three different kinds of antibiotics as well as triple-strength ibuprofen, prescription-strength

3

acetaminophen, and hydrocodone. *Id.* ¶ 22.

In the months since last September, Ms. Warwick spent months in pain and suffering, and to this day the site of the procedure has not healed or recovered and continues to cause her significant pain. *Id.* ¶ 24. Because of her experiences, Ms. Warwick will have to undergo treatment for 2-3 years, at a cost of thousands of dollars, to mitigate her injuries. *Id.* ¶ 25. She alleges the Rejuvi treatment "has a long history of causing significant damage, pain, and suffering to numerous patients who have been deceived by Rejuvi's false claims that its treatment is safe and effective." *Id.* ¶ 26.

### B. Allegations Regarding Plaintiff Olson

Ms. Olson received a similar skin tattoo procedure from Ms. Tasse on September 24, 2017. *Id.* ¶ 27. Prior to undergoing the procedure, Ms. Tasse informed Ms. Olson that the procedure was well-tested and safe. *Id.* ¶ 28. Ms. Olson informed Ms. Tasse that she was prone to hypertrophic keloid scarring, and Ms. Tasse assured Ms. Olson that "you will be fine" and reiterated that the Rejuvi product was safe. *Id.* ¶ 29. No patch test was offered prior to the procedure. *Id.*

After undergoing the procedure, the site of the procedure was somewhat itchy, as anticipated, but appeared normal. *Id.* ¶ 30. Before leaving, Ms. Olson was provided a two ounce jar of Rejuvi Super Soothing Cream to use at home during the recovery period after the scab resulting from the procedure fell off. *Id.* Ms. Olson was falsely told that the two ounce jar had a normal retail price of $225; suspicious, she called Rejuvi headquarters, where she was told by Ms. Edios that in fact any $225 price was an overcharge. *Id.*

Ms. Olson complied with all the recovery period requirements, including in particular by ensuring that the site remained completely dry and that it was not scratched. *Id.* ¶ 31. As the tattoo scab started falling off as anticipated, Ms. Olson began the next phase of the after regimen, continuing to comply with all recovery period requirements and using the provided Rejuvi Super Soothing Cream as directed. *Id.* ¶ 32. During this period, after Ms. Olson raised the issue that the Rejuvi Super Soothing Cream she was provided was five months past its "use by" date, Ms. Tasse contacted Ms. Olson by phone. *Id.* ¶ 33. Ms. Tasse stated that she was a certified Rejuvi provider and that she had spoken directly with Dr. Wade Cheng, the CEO and chief scientist, who had

4

assured that product even a year past its "use by" date remained effective. *Id.*

By late October, the site was painful, extremely itchy, swollen, and inflamed, notwithstanding Ms. Olson's compliance with all recovery directives. *Id.* ¶ 34. The itching was particularly intense at night, and significantly interfered with Ms. Olson's ability to sleep. *Id.* Ms. Olson's complaints and requests for a refund were ignored by Ms. Tasse and Rejuvi, and she was told that healing might take up to a year notwithstanding the representations made before the procedure that healing would require a maximum of eight weeks. *Id.* During this period, Ms. Tasse spoke with Ms. Olson and blamed Rejuvi for a "bad batch" of tattoo removal solution. *Id.* ¶ 35. When Ms. Olson discussed that issue Rejuvi Sales Manager Virgil Castaneda, he denied the charge. *Id.*

On November 4, Ms. Olson contacted Dianne Warren, another Rejuvi certified technician, still looking for a solution to her intense discomfort. *Id.* ¶ 36. For the first time, Ms. Olson was informed of the existence of scar gel, although Ms. Warren did not follow through on her promise to actually send some to Ms. Olson. *Id.*

On November 7, Ms. Olson contacted Virgil Castaneda at Rejuvi headquarters regarding her ordeal. *Id.* ¶ 37. Mr. Castaneda also suggested the scar gel might ameliorate the problem, but refused to provide any concrete assistance, saying instead that any problem must have been caused by Rejuvi's certified technician Ms. Tasse. *Id.* Contrary to Mr. Castaneda's claim, Ms. Olson alleges the Rejuvi treatment "has a long history of causing significant damage, pain, and suffering to numerous patients who have been deceived by Rejuvi's false claims that its treatment is safe and effective." *Id.* ¶ 38. Because of her experiences, Ms. Olson will have to a lengthy period of treatment, at a cost of thousands of dollars, to mitigate her injuries. *Id.* ¶ 39.

**C.  Complaint**

Plaintiffs filed the present Complaint on May 8, 2018. Dkt. No. 1. Captioned as a "Complaint for Negligence and Fraud," they bring three causes of action against Rejuvi: (1) Negligence; (2) Intentional Misrepresentation; and (3) Negligent Misrepresentation. Carmen Tasse is not a named defendant. Plaintiffs allege that "[i]n acting as detailed herein, Rejuvi was guilty of oppression, fraud, and/or malice, entitling Plaintiffs to exemplary and/or punitive

5

1 damages pursuant to Cal. Civ. Code § 3294." *Id.* ¶ 52.

Rejuvi filed the present Motion to Dismiss on July 5, 2018. It seeks dismissal of Plaintiffs' fraud claims for two reasons. First, Rejuvi argues it cannot be held liable for Ms. Tasse's conduct because she is a third party and was not acting as Rejuvi's agent. Mot. at 6-8. Second, Rejuvi argues Plaintiffs fail to allege that any of its own representations were fraudulent. *Id.* at 8.

## LEGAL STANDARD

### A. Rule 12(b)(6)

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotations and citations omitted). However, the Court may deny leave to amend for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B.      Fraud**

Fraud allegations elicit a more demanding standard. Rule 9(b) provides: "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Like the basic "notice pleading" demands of Rule 8, a driving concern of Rule 9(b) is that defendants be given fair notice of the charges against them. *See In re Lui*, 646 Fed. App'x. 571, 573 (9th Cir. 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.") (quotation omitted); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare an adequate answer"). This heightened-pleading standard can apply even to claims that do not innately require proof of fraud. *See Vess*, 317 F.3d at 1103-05. If such a claim nonetheless avers fraudulent conduct, then at least those averments must satisfy Rule 9(b); and, if a claim rests "entirely" on a "unified course of fraudulent conduct," then "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103-04.

**DISCUSSION**

Rejuvi first argues Plaintiffs' fraud claims fail because they cannot establish a principal-agency relationship between it and Ms. Tasse. Mot. at 6. Rejuvi contends that "[w]hile Carmen

7

Tasse may have committed fraud in this case, Rejuvi did not because Ms. Tasse was not acting as the agent of Rejuvi." *Id.*

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (as amended) (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006)). Agency is either "actual" or "ostensible." Cal. Civ. Code § 2298. "An agency is ostensible when the principal intentionally, or by want of care, causes a third person to believe another to be his agent who is not really employed by him." *Id.* § 2300. In contrast, "[a]n agency is actual when the agent is really employed by the principal." *Id.* § 2299.

Plaintiffs contend the allegations in their Complaint are sufficient to meet the standards for liability created by an ostensible agent, and that facts uncovered in discovery could support allegations of an actual agency. Opp'n at 4. Thus, the Court only considers whether they have established a plausible ostensible agency relationship.

To allege ostensible agency, Plaintiffs must allege (1) they reasonably believed the agent had the authority to act on behalf of the principal; (2) the principal's act or neglect caused them to believe in the agent's authority; and (3) their reliance on the agent was not due to negligence. *Associated Creditors' Agency v. Davis*, 13 Cal.3d 374, 399 (Cal. 1975). Here, Plaintiffs allege Ms. Tasse: sold services and products developed by Rejuvi (Compl. ¶ 7); was trained by Rejuvi to sell its products and services (*id.*); told Ms. Olson she was certified by Rejuvi to perform the Rejuvi tattoo removal procedure and that she was in "constant communication" with Rejuvi (*id.* ¶¶ 8-10); and told Ms. Olson she spoke directly with Rejuvi's CEO and chief scientist when Ms. Olson began suffering from the procedure (*id.* ¶ 33). These allegations sufficiently allege that (1) Plaintiffs reasonably believed Ms. Tasse had the authority to act on Rejuvi's behalf with respect to its tattoo removal procedure; and (2) Rejuvi either allowed Ms. Tasse to make such statements or neglected to prevent her from doing so, thereby causing Plaintiffs to believe Ms. Tasse was Rejuvi's agent. Moreover, none of the allegations suggest that (3) Plaintiffs' reliance on Ms.

Tasse's statements was negligent. Further, whether Rejuvi did in fact have some degree of control over Ms. Tasse's conduct and activities is a question to be answered in discovery. *Griley v. Nat'l City Mortg.*, 2011 WL 219574, at *5 (E.D. Cal. Jan. 19, 2011) (citing *Warden v. PHH Mortg. Corp.*, 2010 WL 3720128, at *5 (N.D. W.Va. Sept.16, 2010). Such a determination is not appropriate at this stage in the case. *Moses v. Harward*, 2014 WL 12577167, at *9 (N.D. Cal. May 27, 2014) ("Usually, ostensible authority is for the trier of fact to resolve and should not be decided on summary judgment.") (citing *Am. Cas. Co. v. Krieger*, 181 F.3d 1113, 1122 (9th Cir. 1999)). Accordingly, Plaintiffs allege a plausible claim for fraud under an ostensible agency theory.

Rejuvi next argues Plaintiffs fail to allege any of its own representations were fraudulent. Mot. at 8. However, while Plaintiffs make a number of factual allegations regarding statements made by representatives at Rejuvi headquarters, they admit "they are not the statements upon which the fraud claims are based," and they are therefore "not part of the cause of action" for fraud. Opp'n at 3 n. 1; *id.* at 5. This argument is therefore irrelevant.

## CONCLUSION

Based on the analysis above, the Court **DENIES** Rejuvi's Motion to Dismiss Plaintiffs' fraud claims.

**IT IS SO ORDERED.**

Dated: July 27, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge